2020 IL App (1st) 181471-U

FIFTH DIVISION
October 30, 2020

No. 1-18-1471

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17 CR 9946 |
| AARON WILLIAMS, | ) ) | Honorable Timothy Chambers, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Hoffman and Rochford concurred in the judgment.

**ORDER**

¶ 1    ***Held:*** We affirm the defendant's aggravated battery conviction and sentence. On this limited record, we are unable to determine whether trial counsel rendered ineffective assistance by failing to request a sanity evaluation of the defendant.

¶ 2    Defendant Aaron Williams was charged with six counts of aggravated battery and one count of aggravated unlawful restraint.[1] After a bench trial, the circuit court found defendant guilty on all counts and sentenced him to an extended term of eight years' imprisonment. On direct

---

[1]    In a separate case, defendant was charged with criminal damage to government supported property, which the State later terminated by *nolle prosequi*.

appeal, defendant argues that trial counsel was ineffective for failing to request a sanity evaluation. We affirm.

¶ 3                                   BACKGROUND

¶ 4     Defendant's aggravated battery and unlawful restraint charges stemmed from an incident that occurred on June 13, 2017, in a Chicago parking garage. The arrest report indicated that defendant "viciously and brutally" beat and kicked the victim about the face and head with closed fists for about 20 minutes after attempting to remove the victim's bag. The arrest report includes questions asking whether the arrestee appeared to be irrational or have serious mental problems. The arresting officers indicated "no" to those questions on the arrest report.

¶ 5     On June 15, 2015, during defendant's bond hearing, the assistant public defender requested a "healthcare order," to which the circuit court stated, "[t]hat will be allowed." A public safety assessment of defendant conducted the same day included a "self reported mental health" section, in which defendant affirmatively indicated that he had a current mental health problem, a history of mental health problems, and had received treatment. The record contains no "healthcare order." However, at a September 17, 2018 hearing before a different circuit judge, the assistant State's Attorney told the court, "I have a note to let the attorney know that a PD health order was granted at Central Bond Court per our file." Defense counsel responded, "I don't know what that means." The court asked, "A PD health order?" I don't know what that means." The assistant State's Attorney did not have a copy of the order in her file. The court asked defendant if he had been seen by a doctor or sent to the hospital. Defendant responded no. Again referring to the "health order," the court stated, "I don't know what that means" and "I don't see anything in the file that reflects what that means." Defense counsel stated, "I will look." The court then scheduled the next hearing date and stated, "I don't know that that order will have any bearing on the case itself, but since

you're on notice, you're on notice." When you find out what it is, you can certainly let me know. I'm not familiar with that."

¶ 6     On December 7, 2017, the State elected to proceed on the aggravated battery charges. That same day, defendant filed an answer raising no affirmative defenses, but instead stating that he would "rely upon the State's inability to prove him guilty beyond a reasonable doubt."

¶ 7     On February 13, 2018, defendant filed a handwritten *pro se* motion to dismiss the indictment. The motion alleged misconduct before the grand jury by way of "perjured" police testimony concerning the victim's laptop computer, which defendant used to strike him. Defendant argued that the State and police officers committed prosecutorial misconduct and had engaged in "improprieties" and made "false statements" to produce a charging instrument. Defendant argued his own motion to dismiss, which the circuit court denied.

¶ 8     At trial, the parties stipulated that the security video from the parking garage accurately depicted the sequence of events from 3:30 p.m. until 4:15 p.m. on June 13, 2017. That afternoon, John Nelson parked on the first floor of the garage to visit the health club located on the third floor. Before entering the elevator on the first floor, he heard a baby crying and, for a few seconds, saw the baby with a family parked in a car. When he exited the elevator on the third floor, defendant jumped out from behind a column and confronted Nelson. He asked Nelson, "Who did it?" Nelson did not understand what defendant was referring to and did not respond. Defendant then asked Nelson, "What did you do?" He looked at the bag Nelson was carrying. Nelson noticed a camera in the parking garage vestibule, pointed towards it, and told defendant that someone is watching and that "he should just run away."

¶ 9     As Nelson attempted to exit the vestibule, defendant grabbed Nelson's shirt, threw him against the wall, and pushed him into the corner. Nelson struggled to open the vestibule door to

exit, but defendant wrestled with him until both were outside the vestibule. Defendant pushed Nelson against a railing several times and pinned Nelson to the ground. Defendant used his body weight and excessive force to keep Nelson's shoulders, arms, and head pinned down. During the incident, Nelson heard defendant say numerous things, most of which he could not understand. Defendant repeatedly asked Nelson "What did you do to that little girl?" Nelson responded that there was no little girl and that he did not understand what defendant meant.

¶ 10    As defendant continued to pin Nelson to the ground, he opened Nelson's belongings, including his wallet and bag. Several cars and one pedestrian passed by, at which point defendant stated that "he's calling." Defendant hit Nelson numerous times with his fists and with Nelson's laptop. He also repeatedly kicked Nelson. While he beat Nelson, defendant mentioned that he had been to prison four times and that his father was a preacher. He also told Nelson that he should repent for his sins. In addition to Nelson's testimony, the security footage showed Aaron balancing Nelson's laptop on his head for about 34 seconds while sitting on top of Nelson.

¶ 11    Defendant continued attacking Nelson for one half hour until emergency personnel arrived. The security footage showed that defendant moved out of the way and remained at the scene after emergency personnel left with Nelson.

¶ 12    Nelson sustained a laceration above his left eye that required six stitches. His right eye was also swollen shut and remained black in color and filled with blood for several weeks. Although his retina remained intact, the beating caused an eye condition that he suffered from before the attack to worsen and persist. He also sustained bruising to his arms, hands, face, neck, breast bone, chin, and head. In attempting to fend off the attack, he strained the muscles in his arms, wrists, and hands.

¶ 13    Emergency personnel took Nelson to the hospital, where police officers spoke to him and photographed his injuries. The next day, police officers again met with Nelson and showed him a photo array. Nelson identified defendant as the perpetrator of the attack.

¶ 14    Chicago police officer Syed Kazmi testified that he and his partner, Lester Pineda, arrived at the scene at 4:10 p.m. They had received a call related to a battery that had occurred in the parking garage at 1030 North Clark Street. Officer Kazmi wore a body camera that day, which recorded video from the response to the call. A camera inside Officer Kazmi's marked squad car also recorded video.

¶ 15    As Officer Kazmi drove up to the parking garage, a lieutenant from the Chicago Fire Department approached and provided a description of the offender and the offender's direction of travel. Officer Kazmi began canvassing the area when a pedestrian pointed the officers to the direction of an alley behind Clark Street. The officers proceeded down the alley and located defendant, who matched the offender's description. Defendant was shirtless, with blood on his body, the jeans he wore, and the t-shirt he was carrying. Defendant laid on the ground immediately and spread out his arms. He complied with Officer Kazmi's orders and made no attempt to run as Officer Kazmi handcuffed him.

¶ 16    After the officers secured defendant in the back seat of the squad car, Officer Kazmi asked him about the bloody shirt. Defendant requested to say something. Officer Kazmi advised defendant that he was being recorded. Defendant responded, "that's cool," and stated:

> "Check this out man. When I was on the elevator all I could hear, listen, all I could hear a baby screaming: you killed my mama. Am I, did somebody just, ambulance come for a woman? Did it? Am I right, am I wrong? Right. I know I ain't lying. I

know I wasn't hearing stuff. It's cause I was getting my dick sucked. So I was getting my dick sucked. So I know I ain't hear wrong."

¶ 17    The officers returned to the crime scene, where they met with the fire department lieutenant and a paramedic who treated Nelson. They told the officers that when they arrived at the parking garage, they saw defendant holding Nelson in a headlock.

¶ 18    Defendant made statements about the incident while Officer Kazmi spoke to fire department personnel, but before he had received a *Miranda* warning. For example, when the firefighters mentioned the victim's bag, defendant apparently overheard the conversation and stated, "no armed robbery." Likewise, when the firefighters mentioned the laptop and said that defendant used it to beat Nelson, defendant stated that he beat defendant with his fists and not with the laptop. Officer Kazmi reminded defendant that he was being recorded and that he had just admitted to beating the victim with his fists.

¶ 19    After obtaining additional information from witnesses, Officer Kazmi drove back to the parking garage entrance and sat in the squad car with defendant while Officer Pineda secured the third floor vestibule. At that time, Office Kazmi advised defendant of his rights under *Miranda*. Defendant confirmed that he understood his rights and that he did not want to answer any questions.

¶ 20    Officer Kazmi testified that he asked defendant questions regarding his identity. Defendant provided his name, birthdate, address, and social security number.  Officer Kazmi stopped asking questions after obtaining this information. While the investigation continued and Officer Kazmi sat in the squad car, defendant continued to make statements from the back seat. He denied striking Nelson without reason and directed the officers to ask Nelson "what he did." Defendant also made repeated incoherent statements, including "blow my brains out," that his arrest would start a civil

war, that he be "let out of the whale of Jonah," and to "watch your keys." He claimed numerous times that he did nothing wrong. He stated, "man blow my motherfucking shit up. Man, blow my shit up. You just gonna let a motherfucker rot?" After these statements, Officer Kazmi asked defendant, "You're not trying to use an insanity plea, are you?" Defendant invoked the Lord and Jesus repeatedly as he sat in the back seat. He repeatedly asked, "Where them boys at?" and "Where them gangstas?" He also asked the officers if he was being framed.

¶ 21    Defendant also stated:

"I'm not no fool. My name is Aaron Leon Williams. Anybody that know me. And if I die, they know I was a G. Everybody know. I don't do nothing wrong n*****. Everybody know me. Five different states, from Houston, Texas to pineapple to the big apple. Everybody know me homie. Everybody. Colt football players. Yeah."

¶ 22    As the officers drove defendant to the police station, defendant stated that he "may call the military," and asked the officers, "Y'all gonna smoke me?" He continued, "I must a did something wrong, y'all. I must have. Or y'all in it for the money. Y'all get rich *** that money gonna burn a hole in your pocket." He stated, "No man, come on man ***. What happened to protect and serve? That's why I don't sell dope no more. I ain't sold dope since 2008. You know why? Cause motherfuckers ain't even real no more. You don't know who snitching. You don't know who on whose side. You don't know shit."

¶ 23    When they arrived at the police station, defendant stated, "What's up man, don't shoot me." Officer Pineda opened the passenger door and asked defendant why his arms were positioned in a certain way. Officer Kazmi asked defendant whether he was trying to escape. Defendant responded, "You damn right. If I wanted to escape, take me out these cuffs, I bet you I could whoop you. I bet you I could whoop you." After Officer Kazmi secured defendant in a holding cell,

defendant yelled, "in the seventh grade. I don't need shit from nobody. I didn't collect revenue. Check my social security. I just been laid off three weeks. Y'all being bogus. Check my motherfucking social security number n*****." When Officer Kazmi told defendant that the longer he screamed, the longer he would remain in handcuffs, defendant responded, "I don't care. I don't give a fuck. Send me to the jail. Blow my motherfucking brains out. I don't give a fuck. I'm a gangsta."

¶ 24    Officer Kazmi's body camera video was admitted into evidence in its entirety and portions of it were played in court. Video recorded from the squad car also was admitted into evidence and viewed at trial. Officers Kazmi and Pineda recovered and inventoried defendant's clothing with blood stains from the scene. The Illinois State Police Crime Lab examined the clothing and provided an expert opinion that "there was blood indicated."

¶ 25    During closing argument, defendant argued he "believed that he was doing the right thing," and he "believed that he heard a child in distress." Defendant thought Nelson was responsible for the child's distress and that his actions prevented Nelson from doing any further harm. Defendant argued that the video showed "multiple portions where he's simply holding Mr. Nelson and appears to be waiting for the authorities to arrive," and that even after emergency personnel arrived, "he doesn't run away [and] stays on the scene to tell his version of what happened."

¶ 26    The circuit court found defendant guilty on all counts, concluding "[t]his was nothing short of a brutal, savage beating where [defendant] needed to pause just to catch his breath before going on. There's not a doubt in my mind."

¶ 27    The circuit court ordered the probation department to conduct a presentence investigation of defendant. The report listed defendant's prior convictions, which included a 2014 conviction for aggravated battery with a deadly weapon in Will County, for which he received a two-year

prison sentence. The report also provided defendant's psychological history, stating that defendant "denied having any past or present psychological problems." The report further stated that defendant had never been seen by a mental health professional.

¶ 28    During the sentencing hearing, defendant argued that "based on all of the statements he made to all of the officers involved in this case as well as the detectives, [he] thought he was doing the right thing." He also argued that he stayed on the scene after emergency personnel arrived "because he thought he was waiting for the police to arrive to arrest Mr. Nelson to deal with whatever issue caused the baby to be crying in that parking lot." In allocution, defendant stated that he made a misjudgment "in the heat of the moment." The circuit court stated, "I certainly don't think this was a mistake. I think this was an intentional criminal act." The court continued:

> "No one is saying that you tried to kill him or you would have been charged with attempt first degree murder. You were charged with aggravated battery, but this case is, I think, a textbook example of extremely brutal and heinous conduct indicative of wanton cruelty. You are most certainly eligible for an extended term."

¶ 29    The circuit court granted the State's motion for an extended term and sentenced defendant to eight years in prison. This appeal followed.

¶ 30                                    ANALYSIS

¶ 31    Defendant argues that trial counsel was ineffective for failing to request a sanity evaluation, considering that the sole issue at trial was his state of mind at the time of the offense. Defendant contends that trial counsel had sufficient facts to warrant an investigation into his mental health and particularly, his sanity, at the time of the offense. He argues that counsel was aware that a "PD health order" had been entered and that the public safety assessment indicated a self-reported history of mental health problems and treatment. Further, he contends that the videos of the

recorded events demonstrated bizarre behavior, suggesting he was paranoid and delusional to the extent he could not appreciate the criminality of his conduct. He argues that counsel's failure to explore this issue and seek the necessary assistance of a psychiatrist to examine him and assist in the evaluation, preparation, and presentation of the offense was unreasonable.

¶ 32    In Illinois, "[a] person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct." 720 ILCS 5/6-2(a) (West 2016). The terms "mental disease or mental defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct. 720 ILCS 5/6-2(b) (West 2016). The fact that a defendant forms unrealistic judgments and is unable to evaluate situations that confront him does not constitute a "mental defect" within the statute defining insanity. *People v. Miller*, 33 Ill. 2d 439, 443 (1965). Further, the fact that a defendant engaged in unusual behavior or made bizarre or delusional statements does not compel a finding of insanity. *People v. McCullum*, 386 Ill. App. 3d 495, 504 (2008) (citing *People v. Gilmore*, 273 Ill. App. 3d 996, 1000 (1995)). In addition, a defendant can suffer mental illness without being legally insane. *Gilmore*, 273 Ill. App. 3d at 1000. Finally, the commission of atrocious crimes are not in themselves evidence of insanity. *People v. Robinson*, 22 Ill. 2d 162, 167 (1961).

¶ 33    Here, defendant argues ineffective assistance of counsel for failure to investigate an insanity defense. Claims of ineffective assistance of counsel are evaluated under the two-prong test set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Graham*, 206 Ill. 2d 465, 476 (2003). To support a claim of ineffective assistance of counsel, defendant must demonstrate that counsel's representation was deficient, and as a result, he suffered prejudice. *Strickland*, 466 U.S. at 687. Specifically, defendant must show that

counsel's performance was objectively unreasonable, and that there is a reasonable probability that the outcome of the proceeding would have been different if not for counsel's error. *People v. Henderson*, 2013 IL 114040, ¶ 11. If defendant cannot prove that he suffered prejudice, this court need not determine whether counsel's performance was deficient. *Graham*, 206 Ill. 2d at 476.

¶ 34    "Whether defense counsel was ineffective for failure to investigate is generally determined by the value of the evidence that was not presented and the closeness of the evidence that was presented." *People v. Clark*, 2011 IL App (2d) 100188, ¶ 24 (citing *People v. Morris*, 335 Ill. App. 3d 70, 79 (2002)). Courts use a " 'fact sensitive analysis' " to measure " 'the quality and impact of counsel's representation under the circumstances of the individual case' " when determining whether a defendant has been denied his right to effective assistance of counsel. *Id*. (quoting *Morris*, 335 Ill. App. 3d at 79).

¶ 35    The failure to conduct an investigation and develop a defense has been found to be ineffective assistance of counsel. *Id*. ¶ 26 (citing *Morris*, 335 Ill. App. 3d at 79). "Defense counsel has a professional obligation, both legal and ethical, to explore and investigate a client's potential defense." *Id*. ¶ 25 (citing *Morris*, 335 Ill. App. 3d at 79 (citing *Brown v. Sternes*, 304 F.3d 677, 692 (7th Cir. 2002) and *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997) (*en banc*))). Defense counsel's fundamental obligation necessarily requires a discussion with the client regarding a possible defense. *Clark*, 2011 IL App (2d) 100188, ¶ 25.

¶ 36    In this case, the record does not show what defense counsel did or did not do to investigate an insanity defense. *People v. Ressa*, 2019 IL App (2d) 170439 is instructive here. In *Ressa*, the defendant was found guilty of two counts of aggravated criminal sexual abuse for physical contact with children and five counts of child abduction. 2019 IL App (2d) 170439, ¶ 1. The defendant had been previously diagnosed with " 'delusional disorder, grandiose type (with religious content),

continuous.' " *Id*. The State filed a motion for a psychological evaluation of the defendant in anticipation of a possible insanity defense under section 115-6 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-6 (West 2014)). *Id*. ¶ 23. The defendant did not object and after an evaluation, a doctor concluded that the defendant " 'does not present with symptoms of a psychiatric disorder that would have impaired his ability to lack substantial capacity to appreciate the criminality of his conduct.' " *Id*. ¶ 23.

¶ 37    The *Ressa* court noted the evidence of the defendant's mental illness in the record. Further, the defendant cited other examples in the record of statements he made comparing himself to Jesus and other " 'disturbing and frankly sick statements.' " *Id*. ¶ 24. However, the court concluded that the record "does not reveal whether counsel investigated the issue." *Id*. ¶ 25. The court stated it was possible that counsel did investigate and received information that would not support an insanity defense. *Id*. In addition, the court was unable to determine whether the defendant was prejudiced by counsel's decisions. *Id*.

¶ 38    Defendant argues this case is distinguishable from *Ressa* because here, the record shows he was never evaluated as to his sanity at the time of the offense. However, unlike *Ressa*, the record contains scant evidence of defendant's mental health history. The record evidence of defendant's mental health included a public safety assessment of defendant conducted prior to his bond hearing, in which he self-reported that he had a current mental health problem, a history of mental health problems, and had received treatment. A presentencing investigation report provided defendant's psychological history, where defendant "denied having any past or present psychological problems." This report further stated that defendant had never been seen by a mental health professional.  Defendant relies heavily upon his conduct memorialized from the recorded events during and after the incident as evidence requiring further investigation of an insanity

defense. However, "bizarre behavior or delusional statements do not compel an insanity finding, as a defendant can suffer mental illness without being legally insane." *Id.* ¶ 24. Further, the record does not show whether defense counsel ever investigated the "healthcare order" entered during defendant's bond hearing. The record contains no explanation of why defense counsel requested the order.

¶ 39    As in *Ressa*, the record here does not indicate whether counsel investigated defendant's sanity at the time of the offense and if so, what evidence was discovered. Consequently, we cannot determine whether defendant was prejudiced by counsel's decisions under *Strickland*. *Id.* ¶ 25. As stated in *Ressa*, "if defendant has supporting evidence or can develop it, a collateral proceeding offers the appropriate forum for such a claim." *Id.* ¶ 27 (citing *People v. Clark*, 406 Ill. App. 3d 622, 640 (2010) (noting that claims for ineffective assistance of counsel are preferably brought on collateral review because the trial record is often insufficient to support such a claim)).

¶ 40    In sum, the record in this case does not support a claim of ineffective assistance of counsel. The lack of record evidence precludes us from being able to implement a fact-sensitive analysis to measure the quality and impact of counsel's representation under the circumstances here to determine whether defendant has been denied his right to effective assistance of counsel. *Clark*, 2011 IL App (2d) 100188, ¶ 24 (citing *Morris*, 335 Ill. App. 3d at 79). Accordingly, defendant's claim must fail and we affirm his conviction and sentence.

¶ 41                              CONCLUSION

¶ 42    We affirm the judgment of the circuit court.

¶ 43    Affirmed.